IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JASON REGAN,

           Plaintiff,

v.

SIERRA INTERNATIONAL MACHINERY, LLC,

           Defendant.

3:15-CV-2302-PK

OPINION AND ORDER

PAPAK, Magistrate Judge:

Plaintiff Jason Regan (a citizen of Oregon) filed this action against defendant Sierra International Machinery, LLC ("Sierra") (a citizen of California), in Multnomah County Circuit Court on September 30, 2015. Sierra removed Regan's action to this court effective December

10, 2015, on the ground of diversity jurisdiction.[1]

By and through his complaint, Regan alleges that he was at all material times employed by Bob's Metals, Inc. ("Bob's"), in Portland, OR, as a maintenance employee, and that in that capacity he was injured while working on a large, industrial machine distributed and sold to Bob's by Sierra. It is Regan's position that the design of the machine was unreasonably dangerous, and that it had been sold to Bob's without adequate warnings of the risks it presented. Arising out of the foregoing, Regan alleges Sierra's liability (i) under Oregon's products liability law on a strict products liability theory, and (ii) under Oregon common law for negligence. Regan seeks $750,000 in non-economic damages and approximately $52,000 in economic damages, plus reimbursement of his costs. This court has diversity jurisdiction over Regan's claims pursuant to 28 U.S.C. § 1332, based on the complete diversity of the parties and the amount in controversy.

Now before the court are Sierra's motion (#15) for summary judgment and Regan's informal request for leave to amend his complaint to state particularized allegations of Sierra's negligence. I have considered the motion and the informal request, oral argument on behalf of the parties, and all of the pleadings and papers on file. For the reasons set forth below, Regan's informal request for leave to amend is granted, Sierra's motion (#15) for summary judgment is granted as to Regan's products liability claim and denied as moot with leave to refile as to Regan's negligence claim, summary judgment is entered in Sierra's favor as to Regan's products liability claim only, and Regan is directed to amend his pleading within fourteen days of the date

---

[1] Sierra has taken the position that it did not learn of Regan's state of citizenship until November 25, 2015, and Regan has not challenged the propriety of removal on timeliness grounds.

hereof to re-allege his negligence claim (only) stating particularized allegations of Sierra's complained-of negligence.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND

### I. The Parties

Plaintiff Regan is a citizen of Oregon who at all material times was employed as a maintenance worker at Bob's in Portland, Oregon.

Defendant Sierra is a California limited liability corporation headquartered in California, the members of which are California citizens. At all material times, Sierra was engaged in the business, *inter alia*, of distributing, selling, and servicing industrial machinery.

### II. The Parties' Dispute[2]

Prior to the events Regan complains of, Bob's purchased a T700 SBL Shear/Baler/Logger machine (the "Shear Machine" or the "baler") from Sierra. *See* Complaint, ¶ 1(c). The parties appear to agree that the Shear Machine is intended to shear scrap metal into small pieces, and that it uses a set of cutting blades for that purpose. It appears that the Shear Machine weighs 700 tons, and that its cutting blades are accessible for maintenance purposes, including for replacement of the blades (which must take place approximately every two months), through a heavy top-hinged steel door that plaintiff has calculated as weighing 393 pounds. *See id.*, ¶ 2. It is undisputed that the primary purpose of the door is to prevent chunks of sheared metal from being projected out from the Shear Machine, which otherwise might "literally fire out like bullets. . . ." Declaration of John M. Socolow ("Socolow Decl."), Exh. E (Deposition of Stephen Simmons ("Simmons Depo."), 40:5-22. The door that affords access to the cutting blades is sufficiently heavy to require that it be lifted by a forklift, following which it must be held in the

---

[2] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

vertical, open position by a chain secured to the machine itself. *See* Socolow Decl., Exh. H (Declaration of Guillermo Sandoval ("Sandoval Depo.")), 23:3-8. The Shear Machine contains no mechanism for raising the door, which cannot move upwards on its own without being lifted by an external force. *See* Simmons Depo., 100:16-18; Socolow Decl., Exh. I (Declaration of Michael Weinstein ("Weinstein Depo.")), 72:19 – 73:11.

The Shear Machine was designed and manufactured in Italy by an entity not named as a party herein prior to its distribution by Sierra. *See id.*, 17:17 – 18:25. In 2009, Sierra sold the Shear Machine to Bob's, installed it at Bob's' scrap-metal recycling facility, and trained Bob's personnel in its use. *See* Socolow Decl., Exh. F (Deposition of Enrique Robles ("Robles Depo.")), 46:3-25. Sierra personnel specifically trained Bob's personnel in how to change out the Shear machine cutting blades. *See id.*, 52:9 – 54:12; *see also* Socolow Decl., Exh. G at 4.

During training and installation, Sierra employees advised Bob's personnel that the preferred method for securing the door in the vertical, open position after it had been lifted to that position with a forklift is for a person to access the chain through the use of a "safety harness, a basket, or [a] man lift." Robles Depo., 54:2-3. When Sierra employees change out cutting blades on shear machines at their own facility, they use a custom-built platform for the person accessing the chain while the door is being lifted by a forklift operated by a second person. *See* Sandoval Depo., 22:18-23. Sierra personnel counseled Bob's personnel that it was up to them to develop their own safe procedures for securing the door in its vertical, open position while it was being held open by a forklift. *See id.*, 52:9 – 54:12; Simmons Depo., 98:3 – 100:11. Bob's personnel understood from Sierra's training and from the owner's manual that it would be up to Bob's' maintenance mechanic "to come up with his best practice" for opening and closing the

Page 5 - OPINION AND ORDER

Shear machine door. Weinstein Depo., 67:5-11. It is the testimony of Bob's' Federal Civil Procedure Rule 30(b)(6) corporate representative that, "[f]or purposes of opening the . . . door and keeping it open to perform maintenance on the shear blade," the problem of doing so safely was of a nature that "an experienced mechanic should know what to do." *Id.*, 70:15-21. Bob's' corporate representative testified that "the door, as designed," was not seen to be a hazard "if it's properly addressed," and that "an experienced mechanic should be able to remediate any danger from it." *Id.*, 72:1-6.

At or around that time it sold the Shear machine to Bob's, Sierra provided Bob's with the machine's owner's manual or operations manual. *See* Simmons Depo., 58:6-17, 22:12-22. The second page of the Shear Machine owner's manual consists of a series of warnings in large and bolded font stating in part as follows:

- **THE PERSONNEL RESPONSIBLE FOR THE OPERATION AND MAINTENANCE OF THIS BALER MUST BE FAMILIAR WITH THIS MANUAL PRIOR TO OPERATING OR MAINTAINING THIS EQUIPMENT.**

- **SIERRA . . . ACCEPTS NO RESPONSIBILITY FOR CONDITIONS CAUSED BY INAPPROPRIATE . . . MAINTENANCE OF THE BALER.**

- **SIERRA RECOMMENDS THAT THIS MANUAL BE KEPT IN OR NEAR THE MACHINE AT ALL TIMES.**

- **IT IS THE RESPONSIBILITY OF THE OWNER TO ASSURE THAT THE MACHINE IS . . . MAINTAINED BY QUALIFIED PERSONNEL.**

**NOTICE: DEATH OR SEVERE INJURY CAN OCCUR IF PROPER SAFETY PRECAUTIONS ARE NOT FOLLOWED**

- **The purpose of this manual is to highlight the safety features of the equipment and to provide guidance in the operation and maintenance of the machine. Sierra . . . asks that all users read**

> and familiarize themselves with the contents of this manual and
> that the owner shall provide comprehensive safety and operational
> training to all personnel associated with operation and
> maintenance of the equipment.
>
> - Upon delivery and acceptance by the customer, *it is the
>   responsibility of the owner to develop, implement, monitor and
>   enforce such measures as he/she determines necessary to assure safe
>   operation and maintenance of the equipment.*

Socolow Decl., Exh. O (Report of Thomas R. Fries, P.E. ("Fries Report")) at 11 (bolded emphasis original; italicized emphasis supplied).

On December 18, 2013, Regan, who had at that time been employed as Bob's' lead mechanic for over a year, worked with his assistant, Trevor Ford, to replace the Shear Machine cutting blades. *See* Affidavit of R. Brendan Dummigan ("Dummigan Aff."), Exh. B (Declaration of Jason Regan ("Regan Decl.")), ¶¶ 2-3. At that time, Regan had previously changed out the blades three to five times, each time with Ford's assistance. *See* Socolow Decl., Exh. K (Deposition of Jason Regan ("Regan Depo.")), 80:20 – 81:2, 81:7-10. Before Ford began lifting the door with a forklift, Regan climbed more than seven feet up the side of the Shear Machine and positioned himself above the door and within its path of motion to wait for it to be raised to a sufficiently high position that he could secure it with its chain. *See* Regan Decl., ¶¶ 5-6; *see also* Regan Depo., 82:19 – 84:16; 99:24 – 100:19. It was at that time Bob's express policy always to use a safety cage and harness when going up above four feet. *See* Socolow Decl., Exh. L (Deposition of Trevor Ford ("Ford Depo.")), 14:3-6. A man lift and a safety basket were available for Regan's use at that time, and Bob's does not know why Regan did not use them on that occasion. *See* Weinstein Depo., 76:2-25. Regan understood how to use both the man lift and the safety basket at the time. *See* Regan Depo., 70:10-19. Regan did not believe at the time

Page 7 - OPINION AND ORDER

that there was insufficient space to access the chain with a man lift while the door was being lifted with a forklift. *See id.*, 98:1-4.

Ford later testified that, according to the procedures that Bob's had followed seventy times prior to December 18, 2013 (and that he himself had followed some thirty times prior to that date), "you don't climb up [to the door of the Shear Machine] until the door is up," but that on this occasion Regan nevertheless "climbed up on top of it before it was even ready." Ford Depo., 14:10-24. Ford specifically characterized Regan's election to climb the machine before the door was open as having "jumped the gun" or as having gone up "too early," testifying that the door "regularly swings open" when being lifted by the forklift. *Id.*, 15:1-10. Ford testified that on all previous occasions of changing the blades of which he was aware, including the occasions on which Regan had previously secured the door with its chain, he had never seen anyone climb the machine prior to the door being lifted all the way into place. *See id.*, 32:6-17. Ford testified that the reason the door swings is that the forklift stands on a metal plate while it is lifting the door, and the plate is of a size such that the rear wheels of the forklift slip off the plate during the lifting process causing the forklift to lever the door suddenly upwards. *See id.*, 32:20 – 33:9, 36:3-25.

The precise circumstance described by Ford in fact occurred on this occasion, while Regan was in the path of the door (and immediately after he instructed Ford to raise the door higher notwithstanding that he was in its upward path), and the door popped upwards and struck him in the cheek, causing him to suffer injury. *See* Weinstein Depo., 72:7-18, 76:2-8; Regan Depo., 107:23 – 108:13; *see also* Socolow Decl., Exh. A (videorecording of the accident occurring). Bob's would not have expected this accident to occur had the forklift not slipped off

Page 8 - OPINION AND ORDER

the plate it was standing on. *See Weinstein Depo.*, 78:4-15. Ford did not believe the accident was caused by any design defect in the door. *See* Ford Depo., 37:14-17.

After these proceedings were initiated, Regan retained two engineering experts, Thomas R. Fries and John T. Meyers, III. In deposition, Fries testified to his opinion that the accident would not have occurred had Regan not climbed up the Shear Machine before the door had been lifted to the vertical position, and that it also would not have occurred if Ford had not continued operating the forklift with Regan in the upward path of the door. *See* Socolow Decl., Exh M. (Deposition of Thomas R. Fries ("Fries Depo.")), 135:20 – 136:10. Fries nevertheless offered the opinion that the Shear Machine door was "unreasonably dangerous and defective with regard to changing the cutting blades" because the door is heavy, its top hinge created a "stored energy" hazard when the heavy door was lifted to its vertical position, and there were no specifically prescribed methods or procedures for opening it. Dummigan Aff., Exh. C ("Fries opinion") at 2-3. Fries offered this opinion without having first inspected the Shear Machine. *See id.* at 3. Fries opined that the hazard could have been eliminated or reduced if the door were side-hinged, or if the door had been designed with "springs, winches, safety support poles, instructions, decals, and/or a platform that keeps the door open." *Id.* Fries testified that he had "[c]ertainly not" tested any of these alternatives, Fries Depo., 90:24-25, that he had not performed any analysis of the alternatives, including any hazard analysis to determine whether they would be effective in reducing the risk associated with accessing the cutting blades, *see id.*, 91:14-23, 94:2-8, 94:23-25, 95:3-5, 95:17-24, 95:25 – 96:10, 97:17-25, 101:7-11, and that the full extent of the hazard analysis he had performed was to formulate the conclusion that "raising the heavy door is dangerous," *id.*, 91:20-21, *see also id.*, 92:3-6. Fries further opined that the door should have

Page 9 - OPINION AND ORDER

been designed to bear a warning label warning that after the door had been lifted, "it needed to be held in place." *Id.*, 112:12-14.

Meyers proffered an opinion regarding the hazardous nature of the Shear Machine door that was expressly based on his "assumption" that Regan was struck by the door as it fell downward, an assumption which is flatly inaccurate. Socolow Decl., Exh. N (Deposition of John T. Meyers ("Meyers Depo.")), 87:18-19.

Neither party offers evidence in specific connection with Regan's negligence claim, and (as will be discussed below) Regan's complaint contains no allegations characterizing any of Sierra's conduct as negligent.

## ANALYSIS

As noted above, Regan alleges Sierra's liability under Oregon's statutory products liability law on a strict products liability theory, and under Oregon common law for negligence. I address the parties' arguments regarding Sierra's entitlement to summary judgment as to each of Regan's claims in turn, below.

### I. Regan's Products Liability Claim

The potential liability under Oregon law of a seller or lessor of an allegedly unreasonably dangerous product is governed by Or. Rev. Stat. § 30.920. Section 30.920 provides as follows:

> (1) One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition, if:
>
>     (a) The seller or lessor is engaged in the business of selling or leasing such a product; and
>
>     (b) The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or

leased.

(2) The rule stated in subsection (1) of this section shall apply, even though:

  (a) The seller or lessor has exercised all possible care in the preparation and sale or lease of the product; and

  (b) The user, consumer or injured party has not purchased or leased the product from or entered into any contractual relations with the seller or lessor.

(3) It is the intent of the Legislative Assembly that the rule stated in subsections (1) and (2) of this section shall be construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965). All references in these comments to sale, sell, selling or seller shall be construed to include lease, leases, leasing and lessor.

(4) Nothing in this section shall be construed to limit the rights and liabilities of sellers and lessors under principles of common law negligence or under ORS chapter 72.

Or. Rev. Stat. § 30.920. To determine whether a product is so unreasonably dangerous as to be in a defective condition when sold or leased, the Oregon courts apply a "consumer expectations" test, pursuant to which a product is deemed unreasonably dangerous if it is more dangerous than it would be expected to be by the "ordinary consumer" of such products, "with the ordinary knowledge common to the community as to its characteristics." *Ewen v. McLean Trucking Co.*, 300 Or. 24, 27 (1985), *quoting* Restatement (Second) of Torts § 402A, Comment i (1965). The Oregon Supreme Court subsequently clarified that, under Section 30.920, the courts were to apply *only* the consumer expectations test, and not any other test (as, for example, the so-called "reasonable manufacturer" test). *See McCathern v. Toyota Motor Corp.*, 332 Or. 59, 75-76 (2001).

The *McCathern* court accordingly clarified that, under the Section 30.920 standard, the sole method available for a products liability plaintiff "to prove that a product was in a 'defective

Page 11 - OPINION AND ORDER

condition unreasonably dangerous to the user or consumer,'" *id.* at 77, *quoting* Or. Rev. Stat. § 30.920(1), is to "prove that: (1) 'at the time it leaves the seller's hands, the product is *in a condition not contemplated* by the ultimate consumer, which will be unreasonably dangerous to him,'" *id.* (internal modifications omitted; emphasis supplied), *quoting* Restatement (Second), § 402A, Comment g (so defining "defective"), and "(2) 'the product is *dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it*, with the ordinary knowledge common to the community as to its characteristics,'" *id.* (internal modifications omitted; emphasis supplied), *quoting* Restatement (Second), § 402A, Comment i (so defining "unreasonably dangerous"). "Whether a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer is a factual question to be determined by the jury." *Id., citing Heaton v. Ford Motor Co.*, 248 Or. 467, 472-473 (1967). Notwithstanding the foregoing, "*[i]t is the trial court's role. . . to ensure that the evidence is sufficient for the jury to make an informed decision about what ordinary consumers expect.*" *Id.* at 77-78 (emphasis supplied), *citing Heaton*, 248 Or. at 472-473.

> As noted in *Heaton*, in some cases, consumer expectations about how a product should perform under specific conditions will be within the realm of jurors' common experience. *Heaton*, 248 Ore. at 472. However, some design-defect cases involve products or circumstances that are "not so common * * * that the average person would know from personal experience what to expect." *Heaton*, 248 Ore. at 473. **When a jury is "unequipped, either by general background or by facts supplied in the record, to decide whether a product failed to perform as safely as an ordinary consumer would have expected," this court has recognized that additional evidence about the ordinary consumer's expectations is necessary.** *Heaton*, 248 Ore. at 473-74. **That additional evidence may consist of evidence that the magnitude of the product's risk outweighs its utility, which often is demonstrated by proving that a safer design alternative was both practicable and feasible.** *See Heaton*, 248 Ore. at 471 (user has right to expect reasonably safe design).

*Id.* at 78 (internal modifications omitted; emphasis supplied).

Page 12 - OPINION AND ORDER

In addition to establishing that an ordinary consumer of a given product would not contemplate the degree of risk the product presented by and through risk-utility balancing – "which may include proof that a practicable and feasible design alternative was available," *see id.* – the *McCathern* court noted that, alternatively, a products liability plaintiff could satisfy the consumer expectations test by and through a so-called "representational" approach, which requires the plaintiff to show that "the manufacturer specifically represented to the consuming public that the product would be able to perform certain functions, when, in fact, it could not, resulting in the plaintiff's injury," *id.* at 76, 79 (citations omitted). The court specifically noted that:

> [E]vidence related to risk-utility balancing. . . will not always be necessary to prove that a product's design is defective and unreasonably dangerous, *i.e.*, that the product failed to meet ordinary consumer expectations. However, because the parties did not dispute that evidence related to risk-utility balancing was necessary in this case, we leave for another day the question under what circumstances ORS 30.920 requires a plaintiff to support a product liability design-defect claim with evidence related to risk-utility balancing . . . .

*Id.* at 78-79. Quite recently, in 2016, the Oregon Court of Appeals found that a trial court did not err by concluding "that a riding lawn mower is not such a common product that the average juror would, from background and experience alone, have the capacity to assess what ordinary consumers expect of such a product, thereby making the risk-utility evidence necessary to provide a foundation for the jury's assessment of plaintiff's claim." *Purdy v. Deere & Co.*, 281 Or. App. 407, 433-434 (2016).

Where a product liability plaintiff elects or is required to satisfy the consumer expectations test by and through a risk-utility analysis, it is the court's task to "balance the utility of the risk against its magnitude in deciding whether to submit a design defect case to the jury."

Page 13 - OPINION AND ORDER

*Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 67 (1978),[3] *citing Roach v. Kononen*, 269 Or. 457, 464 (1974), *Phillips v. Kimwood Machine Co.*, 269 Or. 485, 501 (1974).

> One of the factors to be weighed in making this determination is the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility. In other words, **the court is to determine, and to weigh in the balance, whether the proposed alternative design has been shown to be practicable.** The trial court should not permit an allegation of design defect to go to the jury unless there is sufficient evidence upon which to make this determination. If liability for alleged design defects is to stop somewhere short of the freakish and the fantastic, **plaintiffs'** *prima facie* **case of a defect must show more than the technical possibility of a safer design.**
>
> In some cases, because of the relatively uncomplicated nature of the product or the design feature in question, evidence of the dangerous nature of the design in question or of a safer alternative design may be sufficient to permit the court to consider this factor adequately. * * *
>
> * * *
>
> In other instances, however, the question of practicability cannot be properly weighed solely on the basis of inference and common knowledge.

*Id.* at 67-68, 69 (footnotes, internal quotation marks omitted; emphasis supplied). In the latter scenario – that is, where the complexity or esoteric nature of the product or proposed design feature is such that inference and/or common knowledge are insufficient to determine the question of practicability – a products liability plaintiff must offer "evidence from which the jury could find the suggested alternatives are *not only technically feasible but also practicable in terms of cost and the over-all design and operation of the product.* It is *part of the required*

---

[3] The *Purdy* court, *supra*, referred to *Wilson* as superseded in part by the enactment of the current version of Section 30.920, which codified the Restatement Second standard of unreasonable dangerousness. However, I see no suggestion in the governing jurisprudence that the *Wilson* court's discussion of the risk-utility balancing test is not still an authoritative statement of Oregon law applicable to that test whenever that test is elected or required.

Page 14 - OPINION AND ORDER

*proof* that a design feature is a 'defect' *to present such evidence.*" *Id.* at 69 (emphasis supplied).

Here, there can be no serious argument that the functional characteristics of the Shear Machine access door are so uncomplicated that a finder of fact could determine the practicability of alternative designs on the basis of inference and common knowledge (as may be illustrated by Regan's expert Meyers' fundamental misapprehension regarding the circumstances of Regan's injury). The Shear Machine is large and complex, and very few members of the general public will have ever seen such a machine in operation. In particular, questions regarding how heavy the door needs to be in order to ensure that metal projectiles do not escape the cutting blades while the machine is in operation, and whether a sliding or side-hinged door could fulfill the door's safety function require esoteric knowledge of the Shear Machine's operation. In fulfillment of the court's gatekeeper function and mandate to ensure that the jury has sufficient evidence to make an informed decision regarding the expectations of an ordinary consumer of a shear machine, I therefore find that Regan's products liability claim cannot survive Sierra's motion for summary judgment unless Regan has met his burden either to offer evidence from which a finder of fact could reasonably conclude that Sierra affirmatively misrepresented the features or the safety of the Shear machine access door (the representational approach) or to offer sufficient evidence to educate the finder of fact regarding the reasonable expectations of the ordinary purchaser of a shear machine by permitting the finder of fact to determine whether proposed alternative access door designs would ameliorate the risks presented, would be technically feasible, and would be practicable both in terms of cost and in terms of the machine's functionality (the risk-utility balancing approach).

Regan has offered no evidence toward satisfying his burden in connection with the

Page 15 - OPINION AND ORDER

representational approach to the consumer-expectations test. As to the risk-utility balancing approach, Regan offers the expert opinions of Meyers and Fries. Meyers' opinion is without probative value here, in that Meyers addressed a risk immaterial to the injury Regan suffered. Fries' opinion, although more clearly material than Meyers', is insufficient to meet Regan's burden to establish that the access door was defective when sold to Bob's. Specifically, and as Fries expressly conceded, Fries performed no testing to determine the practicability of any of his rather vaguely specified alternative designs for the access door (approximately half of which addressed a risk immaterial to the injury Regan suffered). In addition, Fries offered no opinion as to the cost-effectiveness of his proposals. Fries' testimony thus provides no basis for a finder of fact to determine the effectiveness, the feasibility, the functional practicability, or the cost-effectiveness of any of Fries' proposed safety features. Regan does not offer any evidence other than the opinions of Meyers and Fries as to the safety expectations of an ordinary consumer of shear machines.

In fact, the only evidence of record with significant probative value as to the safety expectations of the ordinary consumer of shear machines is the testimony of Bob's' principal and corporate representative that "[f]or purposes of opening the . . . door and keeping it open to perform maintenance on the shear blade," the problem of doing so safely was of a nature that "an experienced mechanic should know what to do," Weinstein Depo., 70:15-21, that "the door, as designed," was not viewed as a hazard "if it's properly addressed," and that "an experienced mechanic should be able to remediate any danger from it, *id.*, 72:1-6. Regan takes the position that a full risk-utility balancing is not necessary for the consumer expectations test to be satisfied, because Fries' testified that the hazard analysis he performed was that "raising the heavy door is

dangerous," Fries Depo., 91:20-21, *see also id.*, 92:3-6. However, Fries' testimony that raising the access door is dangerous is probative of the proposition that the access door presented a hazard, but is simply not probative of the relevant question, namely whether the hazard the door presented was unreasonable by the metric of the expectations of the ordinary consumer of shear machines.

Because Regan has failed to meet his burden to present evidence as to effectiveness, feasibility, functional practicability, and cost-effectiveness, and because Sierra's motion squarely put Regan to that burden, Sierra is entitled to summary judgment in its favor as to Regan's products liability claim.[4] Sierra's motion (#15) for summary judgment is therefore granted as to Regan's products liability claim.

## II. Regan's Negligence Claim

Regan alleges Sierra's negligence "in one or more of the particulars claims [*sic*] in ¶ 7" of his complaint. Complaint, ¶ 5. However, Regan's complaint contains no Paragraph 7, and additionally contains no particularized allegations of negligent conduct in any other paragraph. *See id., passim.* At oral argument in connection with Sierra's motion (#15) for summary judgment, Regan's counsel informally requested leave to amend his complaint to state particularized allegations of Sierra's purportedly negligent conduct. Sierra's counsel indicated that Sierra would oppose such a request on the grounds that amendment would be futile for the same reasons proffered in Sierra's summary judgment briefing in support of summary adjudication of the negligence claim. I advised the parties that I would consider Regan's informal

---

[4] I therefore need not address the parties' alternative arguments as to whether Regan can establish causation of damages.

Page 17 - OPINION AND ORDER

request for leave to amend in light of Sierra's arguments in favor of summary judgment, construed as arguments that amendment would be futile.

To state a claim for negligence under Oregon common law, a plaintiff must show that the defendant owed the plaintiff a duty, that the duty was breached, and that the breach caused the plaintiff harm. *See, e.g., Fazzolari v. Portland School Dist.*, 303 Or. 1, 14-17 (1987). In the absence of a specific duty created, defined, or limited by a specified status, relationship or standard of conduct, "the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Id.* at 17. Specifically, in the absence of a special relationship giving rise to a specific duty of care, to state a claim for negligence under Oregon law a plaintiff must allege:

> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

*Solberg v. Johnson*, 306 Or. 484, 490-491 (1988), *citing Fazzolari*, 303 Or. 1. Although reasonableness is generally a question of fact to be determined by a jury, where there is no doubt that a defendant's conduct was reasonable, the court may resolve the question without submitting it to a trier of fact. *See, e.g., Thurman v. Thomas*, 70 Or. App. 159, 162 (1984), *citing Hamilton v. State*, 42 Or. App. 821, 828-829 (1979).

On the basis of Ford's testimony that "you don't climb up [to the door of the Shear Machine] until the door is up," but that on the occasion of his accident Regan nevertheless "climbed up on top of it before it was even ready," Ford Depo., 14:10-24, Ford's characterization

Page 18 - OPINION AND ORDER

of Regan's election to climb the machine before the door was open as having "jumped the gun" or as having gone up "too early," *id.*, 15:1-10, and the videorecording of the accident itself, *see* Socolow Decl., Exh. A, Sierra argues that the accident was caused by Regan's own conduct rather than by the negligence of Sierra or any other party. Regan's expert Fries conceded that the accident would not have occurred had Regan not climbed up the Shear Machine before the door had been lifted to the vertical position, but further testified that it also would not have occurred if Ford had not continued operating the forklift once Regan was in the upward path of the door. *See* Fries Depo., 135:20 – 136:10.

Although Regan's proffered evidence does not clearly give rise to any inference of Sierra's negligence, I decline to find that the evidence of record entirely forecloses the possibility that Regan could establish that Sierra's conduct was in some conceivable respect negligent. Accordingly, Regan's informal request for leave to amend is granted, Regan is directed to amend his pleading within fourteen days of the date hereof to re-allege his negligence claim (only) and to offer particularized allegations of Sierra's complained-of negligence, and Sierra's motion (#15) for summary judgment is denied as moot and with leave to refile as to Regan's negligence claim.

## CONCLUSION

For the reasons set forth above, Regan's informal request for leave to amend his complaint is granted, Sierra's motion (#15) for summary judgment is granted as to Regan's products liability claim and denied as moot with leave to refile as to Regan's negligence claim, summary judgment is entered in Sierra's favor as to Regan's products liability claim only, and

///

///

Regan is directed to amend his pleading within fourteen days of the date hereof to re-allege his negligence claim (only) stating particularized allegations of Sierra's complained-of negligence.

Dated this 6th day of July, 2017.

_____
Honorable Paul Papak
United States Magistrate Judge