IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JASON REGAN,

          Plaintiff,

v.

SIERRA INTERNATIONAL MACHINERY, LLC,

          Defendant.

3:15-CV-2302-PK

OPINION AND ORDER

PAPAK, Magistrate Judge:

Plaintiff Jason Regan (a citizen of Oregon) filed this action against defendant Sierra International Machinery, LLC ("Sierra") (a citizen of California), in Multnomah County Circuit Court on September 30, 2015. Sierra removed Regan's action to this court effective December

10, 2015, on the ground of diversity jurisdiction.[1]

By and through his complaint as originally filed, Regan alleged that he was at all material times employed by Bob's Metals, Inc. ("Bob's"), in Portland, OR, as a maintenance employee, and that in that capacity he was injured while working on a large, industrial machine distributed and sold to Bob's by Sierra. It was Regan's position that the design of the machine was unreasonably dangerous, and that it had been sold to Bob's without adequate warnings of the risks it presented. Arising out of the foregoing, Regan alleged Sierra's liability (i) under Oregon's products liability law on a strict products liability theory, and (ii) under Oregon common law for negligence.

On July 6, 2017, I granted summary judgment in Sierra's favor as to Regan's products liability claim, but denied summary judgment as moot as to Regan's negligence claim, on the ground that Regan's complaint failed, apparently inadvertently, to allege Sierra's negligent conduct. I directed Regan to amend his complaint to restate his negligence claim only. Regan filed an amended complaint stating a single claim for negligence effective July 18, 2017.

By and through his amended complaint, Regan seeks $750,000 in non-economic damages and approximately $52,000 in economic damages, plus pre- and post-judgment interest and reimbursement of his costs. This court has diversity jurisdiction over Regan's claim pursuant to 28 U.S.C. § 1332, based on the complete diversity of the parties and the amount in controversy.

Now before the court is Sierra's second motion (#31) for summary judgment. I have considered the motion, oral argument on behalf of the parties, and all of the pleadings and papers on file. For the reasons set forth below, Sierra's motion (#31) for summary judgment is granted.

---

[1] Sierra has taken the position that it did not learn Regan's state of citizenship until November 25, 2015, and Regan has not challenged the propriety of removal on timeliness grounds.

Page 2 - OPINION AND ORDER

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

# FACTUAL BACKGROUND

## I. The Parties

Plaintiff Regan is a citizen of Oregon who at all material times was employed as a maintenance worker at Bob's in Portland, Oregon.

Defendant Sierra is a California limited liability corporation headquartered in California, the members of which are California citizens. At all material times, Sierra was engaged in the business, *inter alia*, of distributing, selling, and servicing industrial machinery.

## II. The Parties' Dispute[2]

It appears to be undisputed that, prior to the events Regan complains of, Bob's purchased a T700 SBL Shear/Baler/Logger machine (the "Shear Machine" or the "baler") from Sierra. *See* Amended Complaint, ¶ 1(c). The parties appear to agree that the Shear Machine is intended to shear scrap metal into small pieces, and that it uses a set of cutting blades for that purpose. It appears that the Shear Machine weighs approximately 700 tons, and that its cutting blades are accessible for maintenance purposes, including for replacement of the blades (which must take place approximately every two months), behind a heavy top-hinged steel door that plaintiff has calculated as weighing between 300 and 400 pounds. *See id.*, ¶ 2. It is undisputed that the primary purpose of the door is to prevent chunks of sheared metal from being projected out from the Shear Machine, which otherwise might "literally fire out like bullets. . . ." Declaration (#16) of John M. Socolow ("Socolow Decl."), Exh. E (Deposition of Stephen Simmons (collectively with the Declaration (#32) of Michael Yoshida ("Yoshida Decl. I"), Exh. I, "Simmons Depo."),

---

[2] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

Page 4 - OPINION AND ORDER

40:5-22. The door that affords the most convenient access to the cutting blades is sufficiently heavy to require that it be lifted by a forklift, following which it must be held in the vertical, open position by a chain secured to the machine itself. *See* Socolow Decl., Exh. H (Declaration of Guillermo Sandoval ("Sandoval Depo.")), 23:3-8. The Shear Machine contains no mechanism for raising the door, which cannot move upwards on its own without being lifted by an external force. *See* Simmons Depo., 100:16-18; Socolow Decl., Exh. I (Declaration of Michael Weinstein (collectively with Yoshida Decl. I, Exh. L, "Weinstein Depo.")), 72:19 – 73:11. Notwithstanding the foregoing, it was not necessary to use the door to access the cutting blades for maintenance purposes, as it was possible (if relatively inconvenient) to access the blades from underneath, without any need for moving the door. *See* Socolow Decl., Exh. L (Deposition of Trevor Ford (collectively with Yoshida Decl. I, Exh. N, and Declaration (#38) of Michael A. Yoshida ("Yoshida Decl. II"), Exh. A, "Ford Depo.")), 19:1-23.

The Shear Machine was designed and manufactured in Italy by an entity not named as a party herein prior to its distribution by Sierra. *See* Weinstein Depo., 17:17 – 18:25. In 2009, Sierra sold the Shear Machine to Bob's, installed it at Bob's' scrap-metal recycling facility, and trained Bob's personnel in its use. *See* Socolow Decl., Exh. F (Deposition of Enrique Robles (collectively with Yoshida Decl. I, Exh. K, "Robles Depo.")), 46:3-25. Sierra personnel specifically trained Bob's personnel in how to change out the Shear machine cutting blades. *See id.*, 52:9 – 54:12; *see also* Socolow Decl., Exh. G at 4.

During training and installation, Sierra employees advised Bob's personnel that the preferred method for securing the door in the vertical, open position after it had been lifted to that position with a forklift is for a person to access the chain through the use of a "safety harness, a

Page 5 - OPINION AND ORDER

basket, or [a] man lift." Robles Depo., 54:2-3. When Sierra employees change out cutting blades on shear machines at their own facility, they use a custom-built platform for the person accessing the chain while the door is being lifted by a forklift operated by a second person. *See* Sandoval Depo., 22:18-23. Sierra personnel counseled Bob's personnel that it was up to them to develop their own safe procedures for securing the door in its vertical, open position while it was being held open by a forklift. *See id.*, 52:9 – 54:12; Simmons Depo., 98:3 – 100:11. It is undisputed that Bob's personnel understood from Sierra's training and from the owner's manual that it would be up to Bob's' maintenance mechanic "to come up with his best practice" for opening and closing the Shear machine door. Weinstein Depo., 67:5-11. It is the testimony of Bob's' Federal Civil Procedure Rule 30(b)(6) corporate representative that, "[f]or purposes of opening the . . . door and keeping it open to perform maintenance on the shear blade," the problem of doing so safely was of a nature that "an experienced mechanic should know what to do." *Id.*, 70:15-21. Bob's' corporate representative testified that "the door, as designed," was not seen to be a hazard "if it's properly addressed," and that "an experienced mechanic should be able to remediate any danger from it." *Id.*, 72:1-6.

At or around that time it sold the Shear machine to Bob's, Sierra provided Bob's with the machine's owner's manual or operations manual. *See* Simmons Depo., 58:6-17, 22:12-22. The second page of the Shear Machine owner's manual consists of a series of warnings in large and bolded font stating in part as follows:

> - **THE PERSONNEL RESPONSIBLE FOR THE OPERATION AND MAINTENANCE OF THIS BALER MUST BE FAMILIAR WITH THIS MANUAL PRIOR TO OPERATING OR MAINTAINING THIS EQUIPMENT.**
>
> - **SIERRA . . . ACCEPTS NO RESPONSIBILITY FOR**

> CONDITIONS CAUSED BY INAPPROPRIATE ...
> MAINTENANCE OF THE BALER.
>
> - **SIERRA RECOMMENDS THAT THIS MANUAL BE KEPT IN OR NEAR THE MACHINE AT ALL TIMES.**
>
> - **IT IS THE RESPONSIBILITY OF THE OWNER TO ASSURE THAT THE MACHINE IS ... MAINTAINED BY QUALIFIED PERSONNEL.**
>
> **NOTICE: DEATH OR SEVERE INJURY CAN OCCUR IF PROPER SAFETY PRECAUTIONS ARE NOT FOLLOWED**
>
> - The purpose of this manual is to highlight the safety features of the equipment and to provide guidance in the operation and maintenance of the machine. Sierra ... asks that all users read and familiarize themselves with the contents of this manual and that the owner shall provide comprehensive safety and operational training to all personnel associated with operation and maintenance of the equipment.
>
> - Upon delivery and acceptance by the customer, *it is the responsibility of the owner to develop, implement, monitor and enforce such measures as he/she determines necessary to assure safe operation and maintenance of the equipment.*

Socolow Decl., Exh. O (Report of Thomas R. Fries, P.E. ("Fries Report")) at 11 (bolded emphasis original; italicized emphasis supplied).

On December 18, 2013, Regan, who had at that time been employed as Bob's' lead mechanic for over a year, worked with his assistant, Trevor Ford, to replace the Shear Machine cutting blades. *See* Memorandum (#18) in Opposition to Sierra's First Motion (#15) for Summary Judgment, Exh. A (Affidavit of R. Brendan Dummigan ("Dummigan Aff.")), Exh. B (Declaration of Jason Regan ("Regan Decl.")), ¶¶ 2-3. At that time, Regan had previously changed out the blades three to five times, each time with Ford's assistance. *See* Socolow Decl., Exh. K (Deposition of Jason Regan (collectively with Yoshida Decl. I, Exh. M, "Regan Depo.")),

Page 7 - OPINION AND ORDER

80:20 – 81:2, 81:7-10. Before Ford began lifting the door with a forklift, Regan climbed more than seven feet up the side of the Shear Machine and positioned himself above the door and within its path of motion to wait for it to be raised to a sufficiently high position that he could secure it with its chain. *See* Regan Decl., ¶¶ 5-6; *see also* Regan Depo., 82:19 – 84:16; 99:24 – 100:19. It was at that time Bob's express policy always to use a safety cage and harness when climbing up above four feet. *See* Socolow Decl., Exh. L (Deposition of Trevor Ford (collectively with Yoshida Decl. I, Exh. N, and Declaration (#38) of Michael A. Yoshida ("Yoshida Decl. II"), Exh. A, "Ford Depo.")), 14:3-6. A man lift and a safety basket were available for Regan's use at that time, and Bob's does not know why Regan did not use them on that occasion. *See* Weinstein Depo., 76:2-25. Regan understood how to use both the man lift and the safety basket at the time. *See* Regan Depo., 70:10-19. Regan did not believe at the time that there was insufficient space to access the chain with a man lift while the door was being lifted with a forklift. *See id.*, 98:1-4.

Ford later testified that, according to the procedures that Bob's had followed seventy times prior to December 18, 2013 (and that he himself had followed some thirty times prior to that date), "you don't climb up [to the door of the Shear Machine] until the door is up," but that on this occasion Regan nevertheless "climbed up on top of it before it was even ready." Ford Depo., 14:10-24. Ford specifically characterized Regan's election to climb the machine before the door was open as having "jumped the gun" or as having gone up "too early," testifying that the door "regularly swings" when being lifted by the forklift. *Id.*, 15:1-10. Ford testified that on all previous occasions of changing the blades of which he was aware, including the occasions on which Regan had previously secured the door with its chain, he had never seen anyone climb the machine prior to the door being lifted all the way into place. *See id.*, 32:6-17. Ford testified that

Page 8 - OPINION AND ORDER

the reason the door swings is that the forklift stands on a metal plate while it is lifting the door, and the plate is of a size such that the rear wheels of the forklift slip off the plate during the lifting process causing the forklift to lever the door suddenly upwards. *See id.*, 32:20 – 33:9, 36:3-25.[3]

The precise circumstance described by Ford in fact occurred on this occasion, while Regan was in the path of the door (and immediately after he expressly instructed Ford to raise the door higher notwithstanding that he was in its upward path), and the door swung abruptly upwards and struck him in the cheek, causing him to suffer injury. *See* Weinstein Depo., 72:7-18, 76:2-8; Regan Depo., 107:23 – 108:13; *see also* Socolow Decl., Exh. A (videorecording of the accident occurring). Bob's would not have expected this accident to occur had the forklift not slipped off the plate it was standing on. *See Weinstein Depo.*, 78:4-15. Ford did not believe the accident was caused by any design defect in the door. *See* Ford Depo., 37:14-17.

After these proceedings were initiated, Regan retained two engineering experts, Thomas R. Fries and John T. Meyers, III. In deposition, Fries testified to his opinion that the accident would not have occurred had Regan not climbed up the Shear Machine before the door had been lifted to the vertical position, and that it also would not have occurred if Ford had not continued operating the forklift with Regan in the upward path of the door. *See* Socolow Decl., Exh M. (Deposition of Thomas R. Fries (collectively with Yoshida Decl. I, Exh. H, "Fries Depo.")), 135:20 – 136:10. Fries nevertheless offered the opinion that the Shear Machine door was "unreasonably dangerous and defective with regard to changing the cutting blades" because the

---

[3] As noted above, Ford further testified that it was not necessary to open the door in order to access the cutting blades for maintenance purposes, as the blades were accessible from underneath. *See* Ford Depo., 19:1-23.

Page 9 - OPINION AND ORDER

door is heavy, its top hinge created a "stored energy" hazard when the heavy door was lifted to its vertical position, and there were no specifically prescribed methods or procedures for opening it. Dummigan Aff., Exh. C ("Fries Opinion") at 2-3. Fries offered this opinion without having first inspected the Shear Machine. *See id.* at 3. Fries opined that the hazard could have been eliminated or reduced if the door were side-hinged, or if the door had been designed with "springs, winches, safety support poles, instructions, decals, and/or a platform that keeps the door open." *Id.* Fries testified that he had "[c]ertainly not" tested any of these alternatives, Fries Depo., 90:24-25, that he had not performed any analysis of the alternatives, including any cost-effectiveness analysis or hazard analysis to determine whether they would be effective in reducing the risk associated with accessing the cutting blades, *see id.*, 91:14-23, 94:2-8, 94:23-25, 95:3-5, 95:17-24, 95:25 – 96:10, 97:17-25, 101:7-11, and that the full extent of the hazard analysis he had performed was to formulate the conclusion that "raising the heavy door is dangerous," *id.*, 91:20-21, *see also id.*, 92:3-6. Fries further opined that the door should have been designed to bear a warning label warning that after the door had been lifted, "it needed to be held in place." *Id.*, 112:12-14. Fries subsequently supplemented his opinion to add that a "removable door" would likewise reduce hazards associated with accessing the baler's blades, as would the addition of "chains, or cables, or locks, or winches, that would raise and hold the door in a safe position." Yoshida Decl. I, Exh. G ("Supplemental Fries Opinion"). Fries did not supplement his opinion with hazard analysis, cost-effectiveness analysis, feasibility analysis, or testing. *See id.*

Meyers proffered an opinion regarding the hazardous nature of the Shear Machine door that was expressly based on his "assumption" that Regan was struck by the door as it fell

Page 10 - OPINION AND ORDER

downward, an assumption which is flatly inaccurate. Socolow Decl., Exh. N (Deposition of John T. Meyers ("Meyers Depo.")), 87:18-19.

## III. Procedural History

Regan's complaint, as originally filed, alleged Sierra's negligence "in one or more of the particulars claims [*sic*] in ¶ 7" of his original complaint. Complaint, ¶ 15. However, Regan's complaint contained no Paragraph 7, and additionally contained no particularized allegations of negligent conduct in any other paragraph. *See id., passim*. In consequence of Regan's failure to offer allegations of Sierra's negligent conduct, I directed Regan to amend his complaint to state "particularized allegations of Sierra's complained-of negligence" and denied Sierra's first motion for summary judgment as moot to the extent it addressed Regan's negligence claim.

Effective July 18, 2017, Regan amended his pleading. Regan's amended pleading is substantially similar to his original pleading. *See id., passim*; Amended Complaint, *passim*. Specifically, Regan amended his pleading by removing all of the allegations of his original pleading that specifically addressed negligence, *see* Complaint, ¶¶ 14-15, Amended Complaint, *passim*, by modifying his allegation of the "particulars" in which the Shear Machine was allegedly a defective product to allege that those same "particulars" instead constituted negligence on the part of Sierra, Complaint, ¶ 6, Amended Complaint, ¶ 6, and to allege that Regan's physical injuries were caused solely by Sierra's "negligence" as opposed to Sierra's "strict liability and/or negligence," Complaint, ¶ 8, Amended Complaint, ¶ 8. Regan's Amended Complaint, like his originally filed Complaint, contains no Paragraph 7.

Accordingly, Regan has elected to allege that Sierra's conduct was negligent in precisely the same ways in which he previously alleged that Sierra was strictly liable for distribution of a

Page 11 - OPINION AND ORDER

defectively designed product, specifically as follows:

- a) The Shear Machine was not properly designed because there were no adequate means or methods for safely lifting the approximately 393-pound door from the closed to the open position;

- b) The Shear Machine was not properly designed because there was no adequate mechanism or method for safely securing the approximately 393-pound door in the open position after it was lifted to allow access for maintenance of the shear.

- c) The Shear machine was not properly designed because there was no safe access, either a ladder or a platform, for an employee to work at the location where the approximately-393 pound door could be secured in the open position.

- d) The Shear Machine was not properly designed because its approximately 393-pound door was hinged at the top, rather than the side, which, in the absence of an adequate means of lifting and securing the door, created the foreseeable hazard of the door striking an employee working in or around the Shear Machine, while employees were attempting to lift the door and secure it in the open position, in order to perform maintenance and/or replacement activities on the cutting blades;

- e) The Operator's Manual provided by defendant with the Shear Machine to plaintiff's employer, Bob's Metals Inc., failed to include any written procedures to enable workers to safely change the cutting blades, i.e., a LOTO program, and a safe location and method to raise the door to the open position and secure it, in order to provide safe access to the cutting blades;

- f) The Shear Machine was sold without any or adequate warnings, either by way of warnings in the Operating Manual or other type of manual, or by way of warning decals placed in strategic locations on the Shear Machine itself, of the risk of serious injury to individuals that worked in close proximity to the 393-pound door, when it was being lifted from the closed position to the open position;

- g) The Shear Machine was not properly inspected and tested prior to its sale, which proper testing and inspection would have identified the risk of serious injury to individuals that worked in close proximity to the approximately 393-pound door, when it was being moved from the closed position to the open position[.]

Amended Complaint, ¶ 6.

## ANALYSIS

As noted above, Regan alleges Sierra's liability under Oregon common law for negligence in the design of the Shear Machine, in failing to provide adequate written safety procedures for opening and securing the Shear Machine door, in failing adequately to warn regarding the risk presented by the Shear Machine door, and in failing to inspect or test the Shear machine before selling it to Bob's. To state a claim for negligence under Oregon common law, a plaintiff must show that the defendant owed the plaintiff a duty, that the duty was breached, and that the breach caused the plaintiff harm. *See, e.g., Fazzolari v. Portland School Dist.*, 303 Or. 1, 14-17 (1987). In the absence of a specific duty created, defined, or limited by a specified status, relationship or standard of conduct, "the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Id.* at 17. Specifically, in the absence of a special relationship giving rise to a specific duty of care, to state a claim for negligence under Oregon law a plaintiff must allege:

> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

*Solberg v. Johnson*, 306 Or. 484, 490-491 (1988), *citing Fazzolari*, 303 Or. 1. Although reasonableness is generally a question of fact to be determined by a jury, where there is no doubt that a defendant's conduct was reasonable, the court may resolve the question without submitting it to a trier of fact. *See, e.g., Thurman v. Thomas*, 70 Or. App. 159, 162 (1984), *citing Hamilton*

Page 13 - OPINION AND ORDER

*v. State*, 42 Or. App. 821, 828-829 (1979).

As to the causation element of a claim for negligence under Oregon common law, the Oregon Court of Appeals has held that where a person injured by a risk was fully aware of the risk when the injury occurred, a claim for failure to warn the person regarding the risk will not lie, because in light of the person's awareness of the risk, the absence of adequate warning could not have contributed to causation of the injury. *See Garrison v. Deschutes Cty.*, 334 Or. 264, 278-279 (2002). In so holding, the *Garrison* court expressly rejected the argument that, under such circumstances, the party allegedly responsible for failure to provide an adequate warning regarding the risk could nevertheless be liable on a theory of comparative negligence. *See id.* I find no indication in Oregon law that the Oregon Supreme Court would hold to the contrary, and accordingly adopt the *Garrison* court's holding.

Here, Regan has alleged seven separately enumerated theories of Sierra's negligence. The first four enumerated allegations of negligence, as Regan elected to articulate them by and through his amended complaint, all clearly rely on the premise that Sierra was negligent in connection with designing the Shear Machine. *See* Amended Complaint, ¶ 6(a)-(d). Because it is undisputed that Sierra played no role in designing the Shear Machine, it is clear as a matter of law that Sierra's conduct in connection with designing the Shear Machine could not have contributed in any degree to causation of Regan's injury. Because Regan cannot establish the requisite element of causation in connection with any of his four articulated theories of Sierra's negligence in connection with designing the Shear Machine, Sierra is entitled to summary judgment as a matter of law as to Regan's negligence claim to the extent premised on Sierra's negligent design

thereof.[4]

Regan's seventh enumerated allegation of Sierra's negligence is that Sierra was negligent in failing properly to inspect and to test the Shear Machine before selling it to Bob's, where such inspection or testing would have revealed the safety hazard presented by the Shear Machine door. *See id.*, ¶ 6(g). However, there is no evidence of record with any tendency to suggest that Sierra's alleged failure to conduct proper inspection or testing of the Shear Machine could possibly have caused Regan's injury: patently, Regan's injury was not caused by Sierra's failure to educate itself as to the extent of the safety risk presented by working with the Shear Machine door, and had Sierra engaged in exhaustive testing and inspection of the Shear Machine before selling it, that fact without more would have had no tendency to reduce the risk of Regan's injury. Because Regan has adduced no evidence tending to support his theory that Sierra's alleged negligence in failing adequately to inspect or test the Shear Machine could have caused his injury, Sierra is entitled to summary judgment as a matter of law as to Regan's negligence claim to the extent premised on Sierra's failure to conduct proper inspection and testing.[5]

---

[4] At oral argument in connection with Sierra's motion, counsel for Regan explained that notwithstanding the plain language of Paragraph 6(a)-(d) of Regan's amended complaint, Paragraph 6(a)-(d) was intended to allege Sierra's negligence in connection with selling the Shear Machine without providing adequate warnings as to the safety hazard its access door presented. So construed, it is clear that Paragraph 6(a)-(d) is – again notwithstanding the plain language of Regan's amended complaint – not intended to constitute allegations of Sierra's negligent conduct but rather allegations of background fact in support of the separate and distinct allegation or allegations that Sierra was negligent in failing adequately to warn regarding the alleged defects in the Shear Machine's design. To the extent Paragraph 6(a)-(d) may properly be so construed, it is within the scope of the discussion *infra* of Regan's theory of negligence as alleged by and through Paragraph 6(e) and/or 6(f) of his amended complaint.

[5] Again, at oral argument in connection with Sierra's motion, counsel for Regan indicated that Paragraph 6(g) was intended, notwithstanding its plain language, to articulate Regan's theory that had Sierra understood the full extent of the safety hazard presented by the Shear Machine door, it would have understood the need to warn purchasers of the machine regarding that hazard.

Page 15 - OPINION AND ORDER

Regan's fifth and sixth enumerated allegations of Sierra's negligence articulate Regan's theory that Sierra was negligent in selling the Shear Machine without adequately warning purchasers and users of the machine as to the safety hazard presented by its heavy access door, either through providing adequate written instruction in how to mitigate the risk the door presented or through placing salient and adequate warnings on the machine itself or on its operations manual. Regan's negligence claim to the extent premised on such a theory is without merit as a matter of law for at least two independent reasons.

First, as discussed above, it is undisputed that Regan was at all material times fully aware of the risk presented by the door, and of Bob's' standing safety protocol (developed in connection with training provided by Sierra) for accessing the door safely notwithstanding that risk. Specifically, it is undisputed that Sierra personnel provided Bob's personnel with training in how to change out the Shear Machine cutting blades safely, *see* Robles Depo., 52:9 – 54:12, *see also* Socolow Decl., Exh. G at 4, that in the course of that training, Sierra employees advised Bob's personnel that the preferred method for securing the door in the vertical, open position after it had been lifted to that position with a forklift is for a person to access the chain through the use of a "safety harness, a basket, or [a] man lift," Robles Depo., 54:2-3, that when Sierra employees change out cutting blades on shear machines at their own facility, they use a custom-built platform for the person accessing the chain while the door is being lifted by a forklift operated by a second person, *see* Sandoval Depo., 22:18-23, that Sierra personnel counseled Bob's personnel that it was up to them to develop their own safe procedures for securing the door in its vertical,

---

To the extent Paragraph 6(g) may properly be construed as articulating such a theory, again, that theory is within the scope of the discussion *infra* of Regan's theory of negligent failure adequately to warn as alleged by and through Paragraph 6(e) and/or 6(f) of his amended complaint.

Page 16 - OPINION AND ORDER

open position while it was being held open by a forklift, *see id.*, 52:9 – 54:12, *see also* Simmons Depo., 98:3 – 100:11, and that Bob's personnel understood from Sierra's training and from the owner's manual that it would be up to Bob's' maintenance mechanic "to come up with his best practice" for opening and closing the Shear machine door, Weinstein Depo., 67:5-11. It is further undisputed that the operations manual that Sierra provided to Bob's in connection with Bobs's purchase of the Shear Machine specifically advised in bold font that everyone using the machine should be trained in its safe use, and that purchasers of the machine were responsible for developing safe procedures for operating and maintaining it. *See* Fries Report at 11. It is further undisputed that at the time Regan's injury occurred, Bob's personnel had changed out the cutting blades seventy times without any person suffering an injury such as Regan's, that Regan had previously changed out the blades safely on three to five occasions, that Regan understood and had previously used Bob's' safety protocols for accessing the Shear Machine blades, that on the occasion of his injury Regan simply failed to follow the established safety protocol that he had used in the past notwithstanding that a man lift and safety basket were available to him and that there was adequate room for him to have used them to access the machine. *See* Regan Depo., 70:10-19, 80:20 – 81:2, 81:7-10, 82:19 – 84:16, 98:1-4, 99:24 – 100:19; Ford Depo., 14:3-6, 14:10-24, 15:1-10, 32:6-17, 32:20 – 33:9, 36:3-25; Weinstein Depo., 76:2-25. A finder of fact could not reasonably conclude, in light of the undisputed evidence of record that Regan was at all material times aware of the risk presented by the Shear Machine door and of the established methods for mitigating that risk, that Regan was less than fully aware of the safety hazard presented by the door at the time his injury occurred. As such, under *Garrison, supra*, as a matter of Oregon law the absence of any more salient warning of the extent and nature of the risk

Page 17 - OPINION AND ORDER

presented could not have contributed to causation of Regan's injury. *See Garrison*, 334 Or. at 278-279.

Second, it seems clear in light of the undisputed evidentiary record that, independently of Regan's full knowledge of the door's safety hazard, his injury could not have been caused by any failure adequately to warn regarding the risk. Regan's injury was not caused when the door unexpectedly fell, or when the chain securing the door unexpectedly failed, but rather when the door was thrown upward when the back tires of the forklift Ford was operating slipped off the steel plate Bob's had elected to place by the Shear machine door, causing the front end of the forklift to thrust upwards, in turn causing the door to swing upwards abruptly. Sierra had no control over Bob's' election not to reposition the steel plate (or to use a larger one or a second one) so as to avoid causing the heavy door to swing upwards uncontrollably at some point during its otherwise controlled and slow upward movement, and could not have been expected to foresee that Bob's would adopt a safety protocol that introduced a new and unanticipated risk of propelling the door upwards with sufficient force to cause injury. It was within Sierra's power to warn regarding safety hazards inherent in the Shear Machine itself (as it in fact did, albeit not through placement of warning decals on the machine itself), but not regarding new and unanticipated risks created by the conduct of the purchaser of the machine after the machine left Sierra's possession and control. Because Regan's injury was caused by such a new and unanticipated risk, Sierra's conduct could not have contributed to its causation.

For the foregoing reasons, Sierra is entitled to summary judgment in its favor as to Regan's negligence claim.

///

## CONCLUSION

For the reasons set forth above, Sierra's motion (#31) for summary judgment is granted in its entirety, and summary judgment is granted in Sierra's favor as to Regan's negligence claim. A final judgment will be prepared.

Dated this 14th day of March, 2018.

/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge